**Richmond**

ROBERT A. REID

v.

JUDITH N. REID

No. 0080-87-2

Decided January 3, 1989

COUNSEL

Ronald R. Tweel (Michie, Hamlett, Donato & Lowry, on brief), for appellant.

John K. Taggart, III (Smith, Taggart, Gibson & Albro, on brief), for appellee.

OPINION

KOONTZ, C.J.—Judith N. Reid filed a bill of complaint on June 13, 1984, seeking a divorce from Robert A. Reid on the ground of constructive desertion, custody of the parties' infant children, child and spousal support, equitable distribution of the marital property, and her costs and attorney's fees. Thereafter, Dr. Reid filed an answer and cross-bill seeking a divorce on the ground of desertion, child custody and support, costs and attorney's fees, and such other relief as the court might deem appropriate.

Following numerous interrogatories and motions to produce, by decree of reference entered on July 26, 1985, the suit was referred to a commissioner in chancery. The commissioner conducted an extended *ore tenus* hearing and subsequently filed his report on April 16, 1986. The commissioner recommended that both parties be denied a divorce on fault grounds and that a no fault divorce decree be entered. The commissioner further recommended that Dr. Reid be required to pay child and spousal support, a monetary award of $50,000, and Mrs. Reid's costs and attorney's fees.

Both parties filed exceptions to the commissioner's report, which were overruled by the chancellor. Thereafter, numerous motions to reconsider were filed. Eventually the parties jointly filed a motion requesting the court to enter a no fault divorce but preserving the issue of fault for appeal. On December 15, 1986, the final decree of divorce adopting the recommendations of the commissioner was entered. This appeal by Dr. Reid followed.

Dr. Reid raises the following issues: (1) whether the court erred in denying him a divorce on the ground of desertion; (2) whether the court erred in awarding spousal support to Mrs. Reid; (3) whether the court erred in its equitable distribution award; and (4) whether the court erred in ordering that he pay all of Mrs. Reid's costs and attorney's fees. No issues concerning child cus-

tody and child support are raised in this appeal.

## I. Factual Background

The record in this case is voluminous. We recite the facts in the light most favorable to Mrs. Reid as the prevailing party below and here only to the extent necessary to understand the context in which the separation of the parties occurred. More detailed facts are recited where the specific issues are addressed in this opinion.

The parties were married on June 26, 1965, in Denver, Colorado. Mrs. Reid had obtained a degree in medical technology and was employed at a local hospital. Dr. Reid was in medical school. In 1966, the first of their four children was born. In 1967 the parties moved to New York City where Dr. Reid completed his internship and residency. From 1969 to 1971, Dr. Reid was on active duty in the United States Navy in Norfolk, Virginia. Thereafter, the parties moved to Charlottesville, Virginia, where Dr. Reid obtained a position at the University of Virginia. He ultimately became tenured, head of his division, and director of the nurse practitioner program. During this time Dr. Reid formed the Commonwealth Clinical Systems, Inc. corporation. He eventually left his position with the university and devoted his full efforts to operating this corporation.

During the first years of the marriage in which the parties' remaining children were born, Mrs. Reid was a homemaker. In 1980 she began part-time employment with Commonwealth Clinical and ultimately became its controller. In 1985 Mrs. Reid and two other individuals, with the concurrence of Dr. Reid, formed King Travel, Inc., a travel agency. She was president of this company on the date this suit was heard below.

The parties experienced martial difficulties and underwent counseling beginning in 1983. Their difficulties were not resolved, and Mrs. Reid moved from the marital home on April 16, 1984.

## II. The Desertion and Spousal Support Issues

■ "The decree confirming the commissioner's report is presumed to be correct and will not be disturbed if it is reasonably supported by substantial, competent and credible evidence." *Brawand v. Brawand*, 1 Va. App. 305, 308, 338 S.E.2d 651, 652

(1985). While the report of the commissioner should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence, "[t]his rule . . . is not applicable to pure conclusions of law contained in the report." *Dodge v. Dodge*, 2 Va. App. 238, 242, 343 S.E.2d 363, 365 (1986)(citations omitted). These principles guide our review of the record on the issues of desertion and spousal support raised in this appeal by Dr. Reid.

In his report, the commissioner reflected: "The testimony of Dr. Reid and Mrs. Reid rarely conflicts. They were talking about two different aspects [perceptions] of what were actually separate lives." The record amply supports the appropriateness of this statement. Mrs. Reid testified in detail as to the gradual breakdown in the marital relationship during this nineteen year marriage. The commissioner concluded that in each specific instance Mrs. Reid identified a marital problem, Dr. Reid did not perceive a problem. In fact, almost to the very end of the marriage, as if they lived separate lives, Dr. Reid considered himself happily married, while Mrs. Reid considered her emotional health endangered.

Mrs. Reid makes no allegation of physical or mental abuse. She does not challenge the chancellor's finding that Dr. Reid did not constructively desert her. Rather, in defense of Dr. Reid's allegation of desertion and relying primarily on the reasoning of *Breschel v. Breschel*, 221 Va. 208, 269 S.E.2d 363 (1980), she asserts she was justified in leaving her husband because her emotional health was endangered. Mrs. Reid identifies four marital problems which she asserts caused her condition and which justified her leaving: (1) sexual inactivity, (2) Dr. Reid's excessive work habits, (3) Dr. Reid's failure to assist in the disciplining and rearing of their children, and (4) a lack of "intimacy within the marriage." Accordingly, we rely primarily on Mrs. Reid's testimony to resolve the issues presented here.

It is apparent from the record and particularly Mrs. Reid's testimony that, following the birth of their first child in 1966, the sexual pattern which developed between the couple can best be described as infrequent. While three additional children were conceived and born over the ensuing years, many months passed between acts of sexual intercourse. These periods of abstinence gradually increased until no intercourse occurred for approximately

two to three years prior to the final separation. It is also apparent that Dr. Reid suffered periods of sexual impotency, and that the infrequency of intercourse was more a concern to Mrs. Reid than to Dr. Reid.

Compounding this difficult situation, Mrs. Reid described the work pattern of Dr. Reid which she considered excessive. From the beginning of the marriage, Dr. Reid held more than one job. During the Navy years, he worked at night conducting insurance physicals. After accepting the position at the University of Virginia, he worked at night at the emergency room of a nearby hospital, opened a nearby clinic with two other doctors, and ultimately formed Commonwealth Clinical. There is no dispute that these activities severely limited the time available for Dr. Reid to spend at home with his wife and children.

One of the couple's children was described as "headstrong and hyperactive." Both parties agree that this child was a discipline problem. Mrs. Reid felt that Dr. Reid was not appropriately supportive of her efforts to discipline this child and, rather, conveyed to her the sense that this problem was solely her responsibility.

Mrs. Reid's description of the lack of "intimacy within the marriage," while conceptually understandable, is nebulous at best. On brief, she partially summarizes it as Dr. Reid's refusal "to talk to her about their lives with its joys and its sorrows, about the family and where it was and where it was going, or any other matter not directly related to one of the family financial concerns." We cannot improve on that summary from the evidence. It is fair to say that while Dr. Reid was financially supportive, Mrs. Reid bore the major responsibility for raising the children and maintaining the home. In the process she became unhappy and felt unfulfilled. We accept the commissioner's conclusion that this condition was due in major part to Dr. Reid's denial or lack of recognition of the needs and feelings of Mrs. Reid.

While not specifically asserted by Mrs. Reid as a justification for her leaving, it is clear from the evidence that the marital problems of this couple were compounded by the additional responsibilities assumed by Mrs. Reid when she undertook her duties at Commonwealth Systems and eventually King Travel. These activities were encouraged by Dr. Reid, but they did not produce the personal satisfaction or the lessening of Mrs. Reid's frustra-

tion as they both apparently had hoped. Finally, the purchase of a large sailing boat and Mrs. Reid's enthusiastic involvement in sailing without Dr. Reid, in turn, merely added more stress to the marriage.

The totality of these circumstances substantiate Mrs. Reid's expressed sense of frustration and unhappiness in the marriage. The issue remains, however, whether as a matter of law these circumstances provide a justification for leaving the marriage. In that regard, the additional facts surrounding her leaving become critical.

In April, 1983, in what she describes as an effort to get Dr. Reid's attention, Mrs. Reid informed Dr. Reid that she could no longer endure the stress created by the problems in their marriage. As a result, the parties underwent counseling, which was unsuccessful. Mrs. Reid asserts that at that point she was totally committed to saving the marriage, but that Dr. Reid did not perceive the extent of their problems. The record supports this assertion. Subsequently, in October of that year, Mrs. Reid went on a month long sailing cruise to the Virgin Islands. Upon returning she advised Dr. Reid that she wanted a separation. The separation was delayed because Mrs. Reid underwent a gallbladder operation and she did not want to upset the children at Christmas. She advised the children that she and Dr. Reid were having marital problems and "needed a break from each other." Mrs. Reid testified that she eventually made a deposit on an apartment and on a Friday night again discussed the marriage with Dr. Reid. There was no agreement for a mutual separation. She described this conversation as "not being intimate" but rather, "a superficial sort of thing." On the following Monday, without Dr. Reid's knowledge, Mrs. Reid moved to this apartment. She testified that her intent in leaving the marital home was to make Dr. Reid realize that they had a problem, and that she "couldn't go on with it without doing something about it." This separation occurred on April 16, 1984. Mrs. Reid filed her suit for divorce on June 13, 1984. The chancellor sustained the commissioner's finding that as a matter of law Mrs. Reid did not intend to desert the marriage. We disagree.

"Proof of an actual breaking off of matrimonial cohabitation combined with the intent to desert in the mind of the offender constitutes desertion as grounds for divorce. However, reasons for

leaving the marriage other than an intent to desert may justify discontinuance of the relationship without giving rise to grounds for divorce." *D'Auria v. D'Auria*, 1 Va. App. 455, 459, 340 S.E.2d 164, 166 (1986)(citing *Breschel v. Breschel*, 221 Va. 208, 211, 269 S.E.2d 363, 365 (1980)); *see also Seeman v. Seeman*, 233 Va. 290, 355 S.E.2d 884 (1987); *Capps v. Capps*, 216 Va. 382, 219 S.E.2d 898 (1975); *Rowand v. Rowand*, 215 Va. 344, 210 S.E.2d 149 (1974); *McLaughlin v. McLaughlin*, 2 Va. App. 463, 346 S.E.2d 535 (1986). However, our Supreme Court has held that "one spouse is [not] legally justified in leaving the other spouse merely because there has been a gradual breakdown in the marital relationship." *Sprott v. Sprott*, 233 Va. 238, 242, 355 S.E.2d 881, 883 (1987).

In *Breschel*, the wife suffered from multiple sclerosis for more than fifteen years prior to her marriage. Her condition was under control until her husband brought his son by a prior marriage into the marital home. She was not able to cope with her stepson and her condition deteriorated. She unsuccessfully sought counseling for the family. The husband refused to remove the child from the home. Under these circumstances, the Court held that Mrs. Breschel was free from legal fault in leaving her husband when she reasonably believed her health was endangered and she had unsuccessfully taken reasonable measures to eliminate the danger without breaking off cohabitation. In contrast, the wife in *Sprott* left the marital home after she built what she described as a "psychological wall" between herself and her husband which resulted in the termination of sexual relations. As in *Breschel*, there was no evidence of physical or mental cruelty by the husband. The Court found that the psychological wall created a tension which prompted Mrs. Sprott to leave the marital home and that her decision was not legally justified by the conduct of her husband.

Underlying each of these cases is the judicial resolution of the conflict created by the legal requirement of the assessment of a forfeiture of spousal support where fault is determined, on the one hand, and permitting a spouse to remove herself or himself from an unhealthy marital relationship without suffering the forfeiture of spousal support, on the other hand. The former has long been the general rule in this Commonwealth, and the latter the narrow exception.

In *D'Auria*, Judge Coleman, in discussing the *Breschel* line of cases, noted:

[T]he reasons for the spouse's leaving were due to circumstances which were largely beyond their control. Their reasons for leaving arose primarily from circumstances or from activities of their spouses which, while insufficient to constitute [constructive] desertion, were health threatening or involved physical abuse. Each was free from legal fault because the reasons for discontinuing the marriage relationship were justified and negated that leaving was with the intent to desert.

1 Va. App. at 460, 340 S.E.2d at 167. Similarly, the legal significance of not permitting a gradual breakdown in the marital relationship to justify the leaving of a spouse, as in *Sprott*, is the determination of fault and the resulting determination of the issue of spousal support.

Under the law existing at the time of the present suit, fault, such as desertion, was a bar to spousal support. As we noted in *Dexter v. Dexter*, 7 Va. App. 36, 43, 371 S.E.2d 816, 819 (1988), Code § 20-91(9)(a), our "no-fault" divorce statute, "embodies the legislative recognition of the regrettable fact of human experience that for various reasons parties determine to terminate their marriage." Implicit in that recognition is the further fact of human experience that the concept of marital fault is often inappropriate, difficult to quantify, and artificially imposed on the unique relationship between any particular husband and wife. In short, the conduct that destroys one relationship and becomes "fault" may go unnoticed or even encouraged in another relationship. Thus, the legislature in 1988 removed fault as a bar to spousal support in cases where the party seeking support has "deserted" the other. *See* Code § 20-107.1.

The present case typifies the difficulty prior to the 1988 amendment to Code § 20-107.1 in distinguishing between marital fault, such as desertion, and a legal justification for leaving the marital relationship. The commissioner noted that Dr. Reid apparently "never did, and may still not, understand what his wife was trying to get through to him. This does not make him evil or her a saint. But, it is my conclusion that it was this course of conduct, or rather this failure on his part, which caused her to leave the home

on 16 April 1984 . . . ." Mrs. Reid asserts, much like Mrs. Breschel, that she reasonably believed her emotional health was endangered and she had attempted to eliminate that danger through confronting her husband and counseling. We assume Mrs. Reid harbored these beliefs.

Mrs. Reid's description of her feelings and emotional condition are understandable in terms of human experience. The *cause* of her feelings and emotional condition, however, cannot be attributed factually or legally solely to the conduct of Dr. Reid. Rather, the evidence established that the pattern of conduct, indeed the entire marital relationship, established by both parties in this marriage resulted in her frustration and guided her decision to terminate the marriage. Mrs. Reid's complaints that Dr. Reid absented himself from the home and his proper share of the child discipline while working to provide financially for her and the family cannot serve as the justification for leaving him. Mrs. Reid would have us draw a fine line between where perhaps he excelled in one duty to the family at a sacrifice of another duty. This we cannot do. Her complaint of a "lack of intimacy in the marriage" is, in the final analysis, no more than a reflection of the different personalities of these marital partners and their method of relating to each other. It can be considered no more than a general complaint of unhappiness on the part of one spouse, which is the regrettable risk in all marriages. Finally, her complaint of the infrequency of sexual intercourse was a pattern developed uniquely between them almost from the beginning of the marriage. Moreover, Dr. Reid's periodic impotency was a mutual problem; the solution to which, obviously, was not within his sole control.

Under these circumstances, the most that can be concluded is that there was a gradual breakdown in the marriage relationship. As a result, Mrs. Reid understandably became unhappy and believed her emotional health was endangered. Her response to this problem was to terminate matrimonial cohabitation. The fact that she filed for divorce within two months thereafter belies an intent for a temporary separation. In so doing, she legally deserted the marriage and forfeited her right to spousal support. For these reasons, the commissioner erred in his conclusions of law and the chancellor erred in confirming his report; accordingly we reverse. We remand with directions to vacate the December 18, 1986, decree insofar as it awards spousal support to Mrs. Reid.

## III. The Monetary Award Issue

Pursuant to Code § 20-107.3, the parties presented evidence before the commissioner which detailed their separate and marital property and their respective values. No issue of classification of separate or marital property is presented by this appeal. After providing for the disposition of the major marital assets, the commissioner recommended a $50,000 monetary award in favor of Mrs. Reid. The chancellor adopted this recommendation.

The record reflects that the commissioner carefully considered the evidence of the financial circumstances of the parties, and we need not recite the details. He recommended that the parties divide equally the equity in their real properties, based primarily on his finding that Dr. Reid's monetary contributions to the acquisition of this property were equaled by Mrs. Reid's non-monetary contributions to the well-being of the family and the care and maintenance of the property. The commissioner then found that of the remaining personal property, Dr. Reid was in possession of property valued at $65,721 and Mrs. Reid was in possession of property worth $81,762. In recommending the $50,000 award in favor of Mrs. Reid, the commissioner noted:

[T]he outstanding financial factor is Dr. Reid's superior earning capacity . . . his earning capacity is so superior to that of Mrs. Reid that I believe it must be taken into consideration in determining the propriety and amount of a monetary award . . . fairness requires that she be granted a monetary award to enable her to obtain adequate housing for herself and the minor children . . . and to give her a start in her new life.

Dr. Reid first challenges the value placed on Mrs. Reid's interest in King Travel, which was a part of the $81,762 in property which the commissioner found to be in her possession. Dr. Reid asserts the value was "approximately" $91,000 rather than the $41,799 adopted by the commissioner. We find no merit to this assertion. Three experts testified concerning the value of this property; the commissioner found one of the experts to be more credible and that finding is supported by the evidence. According, the chancellor did not err in adopting that finding.

Dr. Reid next challenges the commissioner's use of (1) his superior earning capacity and (2) Mrs. Reid's need for housing in applying the provisions of Code § 20-107.3. He argues that these factors are limited to considerations of spousal and child support under Code §§ 20-107.1 and 107.2. Furthermore, he argues they are not factors contemplated by the statutory scheme of Code § 20-107.3. Mrs. Reid concedes that earning capacity and need for housing are not expressly among the first ten factors listed in Code § 20-107.3. She argues, however, they are implicitly included within paragraph (11) which provides: "Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." We believe Mrs. Reid's interpretation of this language would extend the chancellor's discretion without limit. Moreover, such an interpretation is contrary to the statutory scheme of determining spousal support and equitable distribution issues.

 "The clear legislative intent embodied in [Code § 20-107.3] is to maintain an appropriate separation between considerations of . . . spousal support and considerations of an equitable division of marital wealth. This is appropriate because support and equitable distribution awards are based on entirely different considerations and serve entirely different purposes." *Williams v. Williams*, 4 Va. App. 19, 24, 354 S.E.2d 64, 66 (1987). "Spousal support involves a legal duty flowing from one spouse to the other by virtue of the marital relationship. By contrast, a monetary award does not flow from any legal duty, but involves an adjustment of the equities, rights and interests of the parties in marital property." *Brown v. Brown*, 5 Va. App. 238, 246, 361 S.E.2d 364, 368 (1987).

 In *Williams*, we noted that the statutory scheme of Code § 20-107.3 recognizes that different and distinct types of interests are involved between adjusting the wealth of the marriage and providing spousal support. We also noted that the adjudications of these interests are not mutually exclusive. "Code § 20-107.3(F) provides that once the marital wealth is reorganized and distributed, the amount of support to be ordered or previously ordered may be affected and where appropriate altered by the court." 4 Va. App. at 24, 354 S.E.2d at 66-67. In the present case, while not designated as spousal support, the monetary award was clearly determined on the factors enumerated in Code § 20-107.1, the

spousal support statute, which directs in part that the court consider "the earning capacity . . . needs and financial resources of the parties . . . ." The resolution of the issue presented in this appeal does not rest on the simplistic conclusion that the monetary award was intended to be spousal support. Rather the error lies in the misapplication of Code § 20-107.3 and the resulting defeat of the statutory scheme embodied in that statute. Specifically, we hold that Code § 20-107.3(E)(11) does not contemplate consideration of earning capacity of one spouse and support needs of the other spouse, which are expressly embodied in Code § 20-107.1 and are more appropriately determined under the latter statute. Code § 20-107.3 provides for the equitable distribution of the *accumulated* marital wealth between the marital parties; it does not contemplate consideration of the *future* ability of one spouse to accumulate what will be separate property or the *future* needs of the other spouse. In short, the marital partnership notion terminates with the termination of the marriage and whatever marital wealth has been accumulated is to be equitably distributed at that time. It is axiomatic that whatever the future may hold for either of the parties has no bearing on the issue of the appropriate division of what has been accumulated by their contributions during the marriage. Thus, in the present case, Dr. Reid's superior earning capacity and his resulting ability to more readily replace that which was accumulated during the marriage was not a proper consideration under Code § 20-107.3. Similarly, Mrs. Reid's need for adequate housing has no bearing on her contributions to the accumulated marital wealth during the marriage and was not a proper consideration under this statute. Because the monetary award was expressly based on these considerations, the commissioner misapplied Code § 20-107.3 and we reverse the decree in which the chancellor adopted the commissioner's recommendation for this monetary award.

## IV. The Award of Attorney's Fees and Cost Issue

Dr. Reid challenges the chancellor's award of attorney's fees and costs, the awards of which he concedes are within the chancellor's sound discretion after considering the circumstances and equities of the entire case. *Artis v. Artis*, 4 Va. App. 132, 138, 354 S.E.2d 812, 815 (1987). Because our holdings on the other issues presented in this appeal substantially alter the circumstances and equities of this case, we vacate the award of attorney's

fees and costs and remand for further consideration in light of this opinion.

In summary, we find that the chancellor erred in denying Dr. Reid a divorce on the ground of Mrs. Reid's desertion and in granting her spousal support. We find that the chancellor erred in the application of Code § 20-107.3 in fashioning a monetary award in favor of Mrs. Reid and remand for further consideration of that issue consistent with the views expressed in the opinion. We vacate the award of attorney's fees and costs and remand for further consideration in light of the altered circumstances and equities resulting from our decision on the other issues.

*Reversed and remanded.*

Benton, J., and Moon, J., concurred.